IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| OREGON WILD, an Oregon non-profit corporation; and CASCADIA WILDLANDS, an Oregon non-profit corporation, | Case No. 6:14-CV-0110-AA<br>OPINION AND ORDER |

       Plaintiffs,

    v.

BUREAU OF LAND MANAGEMENT,
an administrative agency of
the United States Department
of Interior,

       Defendant,

    v.

SCOTT TIMBER Co., an Oregon
corporation; and CARPENTERS
INDUSTRIAL COUNCIL, an Oregon
non-profit corporation,

       Defendant-
       Intervenors.

Jennifer R. Schwartz
Law Office of Jennifer R. Schwartz
325 NE Graham Street, #8
Portland, Oregon 97212

Nicholas S. Cady
Cascadia Wildlands
P.O. Box 10455
Eugene, Oregon 97440
    Attorneys for plaintiffs

Page 1 - OPINION AND ORDER

Sam Hirsch
Acting Assistant Attorney General
Brian M. Collins
U.S. Department of Justice
Environmental and Natural Resources Division
P.O. Box 7611
Washington, DC 20044
        Attorneys for defendant

Robert L. Molinelli
Scott W. Horngren
American Forest Resource Council
5100 SW Macadam Boulevard, Suite 350
Portland, Oregon 97239
        Attorneys for defendant-intervenors

AIKEN, Chief Judge:

        Plaintiffs Oregon Wild and Cascadia Wildlands move for summary

judgment pursuant to Fed. R. Civ. P. 56.   They allege that

defendant, the U.S. Bureau of Land Management ("BLM"), violated the

National Environmental Policy Act ("NEPA"), the Federal Land Policy

and Management Act ("FLPMA"), the Administrative Procedure Act

("APA"), and those statutes' implementing regulations.   Defendant

BLM and defendant-intervenors, Scott Timber Co. ("Scott Timber")

and Carpenters Industrial Council ("CIC"), oppose plaintiffs'

motion and filed cross-motions for summary judgment. For the

reasons set forth below, the Court partially grants plaintiffs'

motion for summary judgement and denies the defense cross-motions.

The Court need not reach plaintiffs' FLPMA claims, because it finds

BLM violated NEPA and APA.

                              **BACKGROUND**

        Plaintiffs challenge BLM's authorization of the White Castle

Project ("project") located in BLM's Roseburg District near the

community of Myrtle Creek in Douglas County. Administrative Record

Page 2 - OPINION AND ORDER

("AR") 739, 770.   In December 2010, the U.S. Secretary of the Interior directed Roseburg and other BLM districts in southwest Oregon to develop demonstration pilot projects to apply the principles of "ecological restoration" developed by Drs. Jerry F. Franklin and K. Norman Johnson ("Franklin and Johnson").   AR 6410; see AR 18332-40.   The White Castle Project is one of two timber harvests that comprise the Roseburg District Secretarial Demonstration Pilot Project ("pilot project").   AR 739.   Plaintiffs do not challenge the pilot project's other timber harvest, the Buck Rising Timber Sale, because it would affect younger trees that do not provide nesting, roosting, and foraging habitat for the threatened northern spotted owl.   Compl. 11.

The federal government listed the northern spotted owl as a threatened species under the Endangered Species Act in 1990, and its population has continued to decline since then, due, in part, to habitat loss from timber harvest. Determination of Threatened Status for the Northern Spotted Owl, 55 Fed. Reg. 26, 114 (June 26, 1990) (codified at 15 C.F.R. § 17.11(h)); AR 1366, 1382.   The White Castle Project falls within the purview of the Northwest Forest Plan ("NWFP"), which coordinates federal efforts to balance environmental concerns with the need for sustainable forest products in the range of the northern spotted owl.   AR 1381.   The project also falls under the Revised Recovery Plan for the Northern Spotted Owl published by the U.S. Fish and Wildlife Service ("FWS") to provide recommendations for the conservation of the species and its habitat.   AR 1382, 2307.   In February 2012, during the

Page 3 - OPINION AND ORDER

project's planning stages, FWS proposed designating almost all of the pilot project area as "critical habitat . . . essential to the conservation of the spotted owl." AR 1011, 16403-506.[1]  In December 2012, after BLM had already approved the project, FWS finalized a critical habitat designation that included an even greater portion of the pilot project area.  AR 475, 478; Designation of Revised Critical Habitat for the Northern Spotted Owl, 77 Fed. Reg. 71876 (Dec. 4 2012).

The White Castle Project implements variable retention harvesting methods,[2] a shift for the Roseburg District, which has relied almost exclusively on less intensive thinning and density management strategies for timber production since 2000.  AR 513. The project would apply variable retention harvesting techniques to 265 acres, retaining 78 acres and logging 187 acres of forest.  AR 740, 537, 544.  The project would harvest the 187 acres in nine separate units clustered within a few miles of one another.  AR 739, 770, 726.  The forest stands to be harvested range in age from 60 to 110 years old, and "most of the stands to be treated are

---

[1] The pilot project's Finding of No Significant Impact noted, "The Roseburg District Secretarial Demonstration Pilot Project is located in an area almost entirely proposed for designation as critical habitat for the northern spotted owl on February 28 2012." AR 1011.

[2] Distinguishable from traditional clear-cutting, the variable retention harvesting method logs some trees and retains others in a predetermined ratio.  Pls.' Mem. Mot. Summ. J. vii; Def.'s Resp. Mot. Summ. J. 22-23; AR 6594.  Trees may be retained in patches (aggregated retention) or dispersed throughout a harvested area (dispersed retention).  AR 6594, 2277.  The project would use both methods to retain trees.  AR 6421, 544.

between 100 and 110 years of age." AR 539.[3]  The project would effectively remove 160 acres of "mature forest," defined as stands over 80 years old.[4]  AR 503 (BLM response to project protest). Defendant-Intervenor Scott Timber purchased the project's timber sale and would harvest an estimated 6,395 thousand board feet of timber.  AR 739; Scott Mot. Intervene 4.

After the White Castle Project's authorization, FWS designated all or almost all 187 acres slated for harvest as critical habitat for the northern spotted owl. AR 1028-29, 1359, 748.[5]  The project would remove habitat within the home ranges[6] of several spotted owls, although no nests would be located in the harvest area.  AR 6468, 748, 1403.  BLM consulted with FWS at all stages of project planning and requested a Biological Opinion ("BiOp") which FWS issued June 4, 2012 and updated and confirmed on January 11, 2013 after FWS approved final critical habitat designations.  AR 1351-

_____

[3]  BLM made this statement in its response to an administrative appeal of the White Castle Project.  AR 539.  More precisely, a review of data from the Environmental Assessment in combination with data from the White Castle Project decision document indicates that forest stands over 98 years old would represent 120 of the 187 acres to be harvested. AR 740, 6445.

[4]  Federal land management documents explain, "In Douglas fir west of the Cascades, [the mature forest] stage typically begins between 80 and 130 years depending on site conditions and stand history."  AR 10016 (NWFP amendment document).

[5]  BLM has not specified precisely how many acres of critical habitat the White Castle Project would eliminate.  For further discussion, see infra note 14.

[6]  A home range is a 1.2 mile radius circle (2,955 acres total) that surrounds a northern spotted owl nesting site and provides food, cover, and other necessities for the owls and their offspring.  AR 6471.

1442 (BiOp), 1027-30 (errata), 475-80 (update).    The BiOp
determined the project would "adversely affect" northern spotted
owls, their critical habitat, and their prey such as red tree voles
but would not jeopardize the continued existence of the northern
spotted owl as a species. AR 1351, 1412-13, 1421-23, 478-80.

The project area contains habitat for the red tree vole, an
arboreal rodent that inhabits older conifer forests and serves as
a key food source for spotted owls. AR 6479. The NWFP sets Survey
and Manage requirements for red tree voles.  AR 6479, 9876, 9878.
During the development of the project, volunteers with the
organization Northwest Ecosystems Survey Team ("NEST") surveyed
project units for voles and submitted evidence of nest sites to
BLM.  AR 4008-11, 3006.  BLM acknowledged NEST's submissions but
rejected the findings and declined to analyze them in the project's
Environmental Assessment ("EA") or to manage the alleged sites in
accordance with the NWFP.  AR 3006, 6480.

In April 2012, BLM issued the EA for the pilot project as a
whole, analyzing the White Castle and Buck Rising project areas
together. AR 6402-6652.  The EA set forth the pilot project's
three-fold purpose:  (1) to demonstrate a variable retention
harvesting model to create complex, early-successional habitat; (2)
to design the pilot project with participation from FWS in order to
apply Recovery Actions from the Northern Spotted Owl Recovery Plan;
and (3) to design and offer timber sales that benefit local and
regional employment and manufacturing.  AR 6411.  The EA assessed
two alternatives:  a no-action alternative and the project as

Page 6 - OPINION AND ORDER

proposed, breaking the analysis of the proposed action into two variations, one with and one without riparian treatments in the Buck Rising Project area. AR 6419-22. In June 2012, after public comment and the FWS BiOp, BLM opted for the proposed project with riparian treatments and issued a Finding of No Significant Impact ("FONSI"). AR 1006-15. In August 2012, BLM authorized both the Buck Rising and White Castle projects. AR 739-87.

On January 22, 2014, plaintiffs filed the present complaint, claiming BLM's analysis and authorization of the White Castle Project violated NEPA, FLPMA, APA, and accompanying regulations. Compl. 19. On May 12, 2014, the Court permitted Scott Timber, the contract holder for the White Castle timber sale, and CIC, a union representing affected lumber mill workers, to intervene. On June 20, 2014, plaintiffs moved for summary judgment, and defendant and defendant-intervenors responded and made cross-motions seeking summary judgment in their favor.[7] Plaintiffs allege BLM violated NEPA by failing to analyze an adequate range of project alternatives; not preparing an Environmental Impact Statement ("EIS"); and failing to take the required "hard look" at the project's potential environmental consequences. Compl. 16-18. Plaintiffs also claim BLM violated FLPMA and NEPA by failing to adhere to NWFP requirements for surveying and managing red tree vole sites. Compl. 19. Plaintiffs ask the Court to find that BLM

---

[7] Defendant-intervenors' pleadings are largely duplicative of BLM's arguments. As such, the Court's discussion of BLM's claims subsumes those of defendant-intervenors, except where otherwise indicated.

violated NEPA, FLPMA, and APA; to vacate the White Castle decision;
and to enjoin BLM from proceeding with the project and compel them
to correct the alleged violations.    Pls.' Mot. Summ. J. 2-3.
Plaintiffs also seek attorney fees and costs. Id. at 3.

## STANDARD OF REVIEW

Courts must review federal agencies' compliance with NEPA or
FLPMA under the APA. 5 U.S.C. § 706. In an APA case, a court will
award summary judgment for the plaintiff if, after reviewing the
administrative record, it determines that the agency's action was
"arbitrary, capricious, an abuse of discretion, or otherwise not in
accordance with law." Natural Res. Def. Council v. Nat'l Marine
Fisheries Serv., 421 F.3d 872, 877 (9th Cir. 2005) (quoting 5
U.S.C. § 706(2)(A)).    Under this standard of review, the court must
"engage in a substantial inquiry," which entails "a thorough,
probing, in-depth review," Native Ecosys. Council v. U.S. Forest
Serv., 418 F.3d 953, 960 (9th Cir. 2005).    However, the court may
not substitute its own judgment for that of the agency.    Lands
Council v. McNair, 537 F.3d 981, 987 (9th Cir. 2008) (en banc),
overruled on other grounds by Am. Trucking Ass'ns Inc. v. City of
Los Angeles, 559 F.3d 1046 (9th Cir. 2009).

The Court need only defer to an agency's decision if it is
"fully informed and well-considered" and must reject an agency
decision that amounts to "a clear error of judgment." Sierra Club
v. Bosworth, 510 F.3d 1016, 1023 (9th Cir. 2007) (citations and
internal quotations omitted).    Specifically, the court will reverse
an agency's decision as arbitrary or capricious

Page 8 - OPINION AND ORDER

if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation that ran counter to the evidence before the agency, or offered one that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Id. (quoting W. Radio Servs. Co. v. Espy, 79 F.3d 896, 900 (9th Cir. 1996)). As such, in order to withstand summary judgment, the "agency must articulate a rational connection between the facts found and the conclusions reached." Sierra Club, 510 F.3d at 1023. Independent of these concerns, the court will set aside an agency's action if it acted without observing procedures required by law. Sierra Club, 510 F.3d at 1023; Idaho Sporting Cong., Inc. v. Alexander, 222 F.3d 562, 567-68 (9th Cir. 2000).

## DISCUSSION

### I.  NEPA Claims

NEPA is a procedural statute that does not mandate particular results but rather sets forth a review process to "ensure that federal agencies take a hard look at the environmental consequences" of a proposed action. Sierra Club, 510 F.3d 1016, 1018 (9th Cir. 2007); Conservation Cong. v. Finley, 774 F.3d 611, 616 (9th Cir. 2014). Critically, NEPA requires agencies considering "major Federal actions significantly affecting the quality of the human environment" to prepare an EIS. 42 U.S.C. § 4332(c); Conservation Cong., 774 F.3d at 616. In order to determine if an EIS is required, an agency may first prepare a less extensive EA. Sierra Club, 510 F.3d at 1018; 40 C.F.R. § 1508.9. If the EA finds the proposed action will significantly affect the environment, the agency must prepare an EIS. W. Watersheds Project

v. Abbey, 719 F.3d 1035, 1050 (9th Cir. 2013). However, if the EA
finds no significant environment impact, the agency may issue a
Finding Of No Significant Impact ("FONSI"), "accompanied by a
convincing statement of reasons to explain why a project's impacts
are insignificant," and then proceed without further study. Sierra
Club, 510 F.3d at 1018.

Plaintiffs argue that the BLM violated NEPA by: (1) failing to
adequately analyze alternative approaches to the project in the EA;
(2) not preparing an EIS; and (3) failing to take a "hard look" at
the project's direct and indirect environmental impacts.[8]  Compl.
16-19.  For the reasons set forth below, the Court finds that the
BLM acted arbitrarily and capriciously, violating the requirements
of NEPA.

**A.  Adequacy of EA Alternatives Analysis**

NEPA requires a federal agency to "study, develop, and
describe appropriate alternatives" to a proposed project
independent of whether the agency is preparing an EA or an EIS.  42
U.S.C. § 4332(2)(E); Bob Marshall Alliance v. Hodel, 852 F.2d 1223,
1229 (9th Cir. 1988); see 40 C.F.R. § 1508.9.  "Informed and
meaningful consideration of alternatives" is "critical to the goals
of NEPA," ensuring that agency decision-makers assess a project's
costs, benefits, and environmental impacts in the correct context.
Bob Marshall Alliance, 852 F.2d at 1228-29.  Although BLM is

---

[8]  Plaintiffs also claim BLM violated NEPA by failing to
consider red tree vole sites.  Because this NEPA claim is closely
linked to plaintiffs' FLPMA claim, this opinion more fully
addresses it in the next section.

correct in asserting it bears a lesser burden to discuss
alternatives in an EA than in an EIS, an EA must still "give full
and meaningful consideration to all reasonable alternatives."
Abbey, 719 F.3d 1035, 1050 (9th Cir. 2013); N. Idaho Cmty. Action
Network v. U.S. Dep't of Transp., 545 F.3d 1147, 1153 (9th Cir.
2008). The Ninth Circuit made clear in Western Watersheds v.
Abbey, "The existence of a viable but unexamined alternative
renders an EA inadequate." 719 F.3d at 1050.

Plaintiffs argue the EA was inadequate, because it failed to
analyze viable alternatives to the proposed project, in particular,
the alternative of limiting the project's variable retention
harvest to younger trees. Pls.' Mem. Mot. Summ. J. 33. In
response, BLM does not dispute the reasonableness of this
alternative but instead argues the agency was not "obligated to
analyze an alternative that Plaintiffs did not even suggest at the
time of the Project decision." Def.'s Reply 21; see Def.'s  Mot.
Summ. J. 30-31. BLM further argues that it fulfilled its NEPA
obligation by "developing and analyzing several alternatives that
encompassed varying levels of environmental impact." Def.'s Reply
21.

The pilot project EA analyzed two alternatives: a no-action
alternative and the project as proposed. AR 6404.[9] The EA also

--------

[9]  BLM divided its analysis of the proposed project into two
"sub-alternatives": one with variable thinning treatments in
riparian reserves and one without such treatments. AR 6404. The
analyzed sub-alternatives presented identical plans for White
Castle Project area. AR 1006, 6431, 739.

provided "reference analyses," briefly discussing and rejecting two different alternative harvest methods: commercial and variable density thinning only; and traditional regeneration harvesting.  AR 6433-42.  The EA did not analyze the possibility of conducting variable retention harvesting in younger stands of trees.

In arguing that its analysis was sufficient, BLM misconstrues its obligations under NEPA.  BLM argues the holding in Western Watersheds established only "the limited proposition" that an EA's analysis of alternatives is adequate unless the agency has "failed to analyze any alternatives that would result in varying levels of environmental impact."  Def.'s Reply 20.  On this basis, BLM concludes that an EA may satisfy NEPA by merely considering some alternative with less environmental impact than the proposed project.  Id.  BLM's interpretation contradicts Ninth Circuit precedent and the plain language of Western Watersheds which hold agencies to the stricter standard of examining *all* viable and reasonable alternatives.  See W. Watersheds v. Abbey, 719 F.3d. at 1050 ("The existence of a viable but unexamined alternative renders an EA inadequate"); Native Ecosys. Council V. U.S. Forest Serv., 428 F.3d 1233, 1246 (9th Cir. 2005)("So long as *all* reasonable alternatives have been considered and an appropriate explanation is provided as to why an alternative was eliminated, the regulatory requirement [for an EA or EIS] is satisfied")(emphasis added); N. Idaho Cmty. Action Network, 545 F.3d at 1153(both EA and EIS must consider all reasonable alternatives, but EIS must provide more detail and analysis of those alternatives); Native Fish Soc. v.

Page 12 - OPINION AND ORDER

Nat'l Marine Fisheries Servs., 992 F. Supp. 2d 1095, 1110 (D. Or. 2014)(holding that a fish hatchery EA was inadequate, because "[w]here a feasible alternative would meet the project's purpose and need, it should be considered").

BLM also improperly places the burden of determining reasonable project alternatives entirely on plaintiffs. Indeed, courts have held that agencies need only consider alternatives that are "ascertainable and reasonably within reach." City of Angoon v. Hodel, 803 F.2d 1016, 1021-22 (9th Cir. 1986). Generally, this means that if plaintiffs fail to raise a viable alternative in their comments, the plaintiffs cannot later object that the subsequent EA failed to consider the alternative. Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 764-65 (2004). However, the U.S. Supreme Court and the Ninth Circuit recognize an exception to this rule. When the agency clearly has independent knowledge of specific issues or concerns, "there is no need for a commenter to point them out specifically in order to preserve its ability to challenge a proposed action." Id. at 765; 'Ilio'ulaokalani Coal. v. Rumsfeld, 464 F.3d 1083, 1093 (9th Cir. 2006); see Friends of the Clearwater v. Dombeck, 222 F.3d 552, 559 (9th Cir. 2000)("Compliance with NEPA is a primary duty of every federal agency; fulfillment of this vital responsibility should not depend on the vigilance and limited resources of environmental plaintiffs").

Although plaintiffs provided extensive public comment on the need to preserve trees over 80 years old, BLM argues they did not

Page 13 - OPINION AND ORDER

suggest the precise alternative they now raise: proceeding with the planned variable retention harvest but on younger trees.  See, e.g., AR 2057, 2037-38, 4731-39, 4699-4702.  However, this is not dispositive, because BLM was aware, well before the EA, of that alternative.  In fact, in a February 2012 report describing the Roseburg Pilot Project, Franklin and Johnson said they "initially planned to use previously harvested stands between 60 and 80 years of age, given our intent of using stands that were less controversial."  AR 2314.  They explained they later chose to harvest older trees, because there was a limited selection of the younger trees and "some stakeholders" wanted to harvest only trees older than 80 years old. AR 2314.  Thus, not only did BLM know of the alternative of limiting variable retention harvesting to trees under 80 years old, it was BLM's original plan for the project. Moreover, the alternative appears reasonable in light of the project's purpose and need, and BLM does not argue otherwise.  In this context, BLM failed to take a "hard look."  Moreover, BLM should have at least acknowledged the alternative in the EA and explained its reasons for rejecting it.  BLM's failure to consider this known alternative was arbitrary and capricious in violation of NEPA and APA.

### B.  EIS Requirement

Plaintiffs also challenge BLM's decision not prepare an EIS. Under NEPA, a government agency must prepare an EIS if a proposed federal action could "significantly affect the quality of the human environment." 42 U.S.C. § 4332(2)(c). Importantly, the significant

effect need not actually occur; it is sufficient to trigger the preparation of an EIS if a substantial question is raised "whether a project may have a significant effect on the environment." Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1212 (9th Cir. 1998). If an agency moves forward without issuing an EIS, the agency must provide a "convincing statement of reasons" to support why the proposed project is not significant; this explanation is critical in demonstrating that the agency took the requisite "hard look" at the potential effects of a project. Id. at 1212.

In determining whether potential effects are significant, agencies and courts should evaluate their "context" and their "intensity." 40 C.F.R. § 1508.27. In assessing the intensity, or the "severity of the impact," courts and agencies should consider up to ten factors. 40 C.F.R. § 1508.27(b).[10] A court may find

---

[10] The Court only discusses relevant factors in this opinion, but the full list of "intensity" factors is as follows:
(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.
(2) The degree to which the proposed action affects public health or safety.
(3) Unique characteristics . . . such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.
(4) The degree to which the effects . . . are likely to be highly controversial.
(5) The degree to which the possible effects . . . are highly uncertain or involve unique or unknown risks.
(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.
(7) Whether the action is related to other actions with individually insignificant but cumulatively significant

substantial risk of a significant effect based on just one of these factors. <u>Ocean Advocates v. U.S. Army Core of Eng'rs</u>, 402 F. 3d 846, 865 (9th Cir. 2004).

Plaintiffs argue that five factors support the preparation of an EIS for the project: (1) the project's highly controversial and (2) highly uncertain effects, (3) the project's precedential effect on future projects, (4) its adverse effects on spotted owls, and (5) potential violations of FLPMA and the NWFP.  Pls.' Mem. Mot. Summ. J. i-ii.  The Court agrees that an EIS is required.

### 1.  Controversiality of the Project

Plaintiffs claim BLM did not properly assess, among other significance factors, the degree to which the project's potential effects are "likely to be highly controversial."  40 C.F.R. § 1508.27(b)(4).  A project qualifies as likely to be highly controversial if a "substantial dispute exists as to [its] size, nature, or effect." <u>Nw. Envtl. Def. Ctr. v. Bonneville Power</u>

--------

impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.
(8) The degree to which the action may adversely affect [sites/structures] listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.
(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.
(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment. 40 C.F.R. § 1508.27(b).

Admin., 117 F.3d 1520, 1536 (9th Cir. 1997).   Mere public
opposition to a proposal does not render it highly controversial.
Id.   Rather, "a substantial dispute exists when evidence, raised
prior to the preparation of an EIS or FONSI casts serious doubt
upon the reasonableness of an agency's conclusions." Nat'l Parks
& Conservation Ass'n v. Babbitt, 241 F.3d 722, 736 (9th Cir. 2001),
abrogated on other grounds by Monsanto Co. v. Geertson Seed Farms,
561 U.S. 139, 157 (2010) (internal citations omitted).

Here, the record provides ample evidence of controversy,
including observations from the project's own guiding scientists,
Franklin and Johnson.   BLM acknowledged the White Castle Project
would effectively remove more than 160 acres of forest stands
ranging in age from about 80-110 years old.   AR 503.   Yet, in
project planning documents and emails, Franklin and Johnson
repeatedly described the harvesting of trees older than 80 years as
"controversial."   AR 2310, 2314, 2296-97; see 18335 (describing
"societal interest" and "continuing legal battles" to preserve
older trees), 6368-71.[11]   In fact, they reported in pilot project
documents, that they deliberately chose a controversial strategy to
stimulate discussion:

> Initially, we intended to do early successional harvests
> in the less controversial previously harvested stands
> (60-80 years of age).   Ultimately we also applied it in
> a natural older stand (90-110 years of age) that had
> experienced no past timber harvest, in part to stimulate
> the dialogue regarding harvests in such forests.

_____

[11] Other project planning documents also describe the
practice as "controversial" and "highly controversial."   AR 4014,
5636, 6368-71.

AR 2310.

BLM argues that the project designers used the term "controversy" to refer to mere social and political opposition and not to "substantial dispute" or legitimate "scientific controversy." Def.'s Resp. Mot. Summ. J. 9-13. However, scientific controversy appears to have accompanied the project from its inception. The 2011 Northern Spotted Owl Recovery Plan recommended applying Franklin and Johnson's techniques but also described them as "controversial." AR 17676. The plan noted differing views among scientists regarding the techniques' impact on the spotted owl. AR 17676. Morever, the Recovery Plan outlined as a primary goal "to conserve older stands that are either occupied or contain high-value spotted owl habitat." AR 17682, 17684. To that end, it suggested applying Franklin and Johnson and their cohort's "active management" strategies to younger and less diverse forest stands. AR 17683-84. Even BLM's own planning documents noted ecological concerns about harvesting trees older than 80 years. AR 18335; 2290. Franklin and Johnson noted that "most BLM stands over 80 years old have not been subjected to timber harvesting," because "such stands have special significance in conservation strategies for species associated with mature and old forests, such as the [northern spotted owl] and the [red tree vole]." AR 2290. Furthermore, during the formulation of the project, FWS proposed and later approved designating project land as critical habitat for the northern spotted owl which nests, roosts, and forages in trees over 80 years old. AR 6468, 6472.

Page 18 - OPINION AND ORDER

Acknowledging, in part, the ecological need to retain dwindling stocks of older trees and spotted owl habitat, Franklin and Johnson initially planned to only harvest forest under 80 years old. AR 2310, 2314.

Members of the public and scientists also raised ecological concerns about BLM's choice to harvest trees over 80 years old. AR 4884-99 (public comment), 1615. BLM considered in its decision-making process a scientific article from the "Journal of Forestry" that criticized Franklin and Johnson's pilot project strategies and, in particular, their failure to adequately protect trees over 80 years old. AR 16230-39; Def.'s Resp. Mot. Summ. J. 11.

Clearly, BLM recognized the highly controversial nature of the project well before issuing the FONSI. The Recovery Plan, the critical habitat proposal, comments from the public and scientists, and Franklin and Johnson's own reports demonstrated the existence of "a substantial dispute" casting "serious doubt upon the reasonableness" of BLM's decision to harvest forest stands over 80 years old. Nat'l Parks & Conservation Ass'n, 241 F.3d at 736. In the FONSI, BLM carried the burden of showing there was no legitimate controversy but failed to do so in its terse one-paragraph acknowledgement of public comment and concerns. AR 1009; see Nat'l Parks & Conservation Ass'n, 241 F.3d at 736 (agency has burden to convincingly refute evidence of controversy). The Court does not express an opinion about the merits of the BLM's decision to harvest designated critical habitat and trees older than 80 years. However, the Court finds that BLM's failure to acknowledge

the "highly controversial" nature of that decision was arbitrary and capricious in light of the evidence in the record. This significance factor weighs in favor of an EIS.

### 2. Uncertain Effects

Plaintiffs also argue BLM failed to properly consider "the degree to which the possible effects . . . are highly uncertain or involve unique or unknown risks." 40 C.F.R. § 1508.27(b)(5). The Ninth Circuit explains, "The purpose of an EIS is to obviate the need for speculation by insuring that available data are gathered and analyzed prior to the implementation of the proposed action . . . . the 'hard look' must be taken before, not after, the environmentally-threatening actions are put into effect." Nat'l Parks & Conservation Ass'n, 241 F.3d at 732-33.

Here, a key uncertainty is whether the project will benefit spotted owls and their habitat in the long term, as BLM and defendant-intervenors repeatedly assert. Def.'s Resp. Mot. Summ. J. 27; Def.'s Reply 13-14; Def.-Ints.' Reply 4-6; AR 746-47, 6410. The 2011 Revised Northern Spotted Owl Recovery Plan suggested testing out Franklin and Johnson's "ecological forestry and restoration" techniques as a way "to address . . . uncertainty" about their effects on spotted owls as well as on shifting disturbance patterns and climate change issues. AR 17676. By its very nature as part of a pilot, the White Castle Project tests something new and uncertain.[12] Moreover, the project's experimental

---

[12] Along these lines, defendant-intervenors define a "pilot project" as "something 'done as an experiment or test before

use of Franklin and Johnson's techniques on older trees that provide critical spotted owl habitat only increases uncertainty. In its brief, BLM quotes almost an entire paragraph from the Recovery Plan to argue that the plan supports projects such as White Castle in forest stands over 80 years old and even in specially designated late successional forest reserves (LSRs). Def.'s Reply 14 (quoting AR 17683-84).    However, BLM omits sentences that stress the need for more research about the effects of applying Franklin and Johnson's methods to older forests. Notably absent is the paragraph's last sentence which states, "Research and monitoring on the specific effects of such treatments on spotted owls and their prey is needed and should evaluate effects on both spotted owl recovery as well as broader forest management goals." AR 17684.  Additionally, in a February 2012 report on pilot projects in Southwest Oregon, Franklin and Johnson noted the need for further research, stating that "scientific reviews can help . . . undertake analysis of the potential for some new alternatives, such as . . . ecologically-based timber harvests within Critical Habitat for the Northern Spotted Owl"-- precisely what is proposed for the White Castle Project.  AR 2274.

BLM's conclusion in the FONSI that "there is little uncertainty regarding [the] effects" of the pilot project runs counter to the evidence in the record.  The outcome of this experimental pilot project is highly uncertain, and thus, this

---

introducing something more widely.'" Def.-Ints.' Resp. Mot. Summ. J. 14 (quoting Oxford English Dictionary).

significance factor favors preparation of an EIS.

### 3.  Precedential Effect

Plaintiffs argue that another factor weighs in favor of an EIS: "the degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration." 40 C.F.R. § 1508.27(b)(6). Generally, this factor is "insufficient on its own to demonstrate a significant environmental impact" unless the approval of the project is binding on future decisions regarding other actions. Anderson v. Evans, 371 F.3d 475, 493 (9th Cir. 2004). However, the factor may still support a need for an EIS. Id.

BLM correctly points out that the project will not bind any other future BLM actions; they would still be subject to NEPA analysis. Def.'s Resp. Mot. SUmm. J. 28. However, BLM also emphasizes repeatedly the project's role as part of a larger series of "pilot projects" aimed at "inform[ing] long-term planning" for management of BLM lands in Oregon and California. AR 6410 (EA), 4947 (press release). Franklin and Johnson described the Roseburg pilot project and its counterpart in the Medford district as important in shaping the development and implementation of the Revised Recovery Plan for the Northern Spotted Owl. AR 18336. "The insights learned [in the two projects] could assist in shaping the role for active management and ecological restoration that has been recognized in the [Northern Spotted Owl] Recovery Plan." AR

18336.  Project materials describe the pilot projects as test of
new harvest methods and "new policies" that could supplant BLM's
current "risk-adverse strategy" of avoiding regeneration harvesting
and other "active management" methods.  AR 644.  Approval of the
White Castle Project will not have binding impact on future
projects, but it will, by design, shape BLM forestry methods and
strategies moving forward.  Although, in this case, the
precedential factor alone is not dispositive, it supports the
conclusion that an EIS is necessary.

### 4.  Effect on the Northern Spotted Owl

Another significance factor is "[t]he degree to which the
action may adversely affect an endangered or threatened species or
its habitat that has been determined to be critical under the
Endangered Species Act of 1973." 40 C.F.R. § 1508.27(b)(9).  Here,
the FWS BiOp concluded that the project would "adversely affect"
the northern spotted owl, its critical habitat, and its prey, but
it would not likely jeopardize the continued existence of the
species.  AR 1351, 1412-13, 1421-23, 1029.  Plaintiffs argue the
adverse effects are sufficient to merit an EIS, while BLM contends
that the effects are not significant given that the project would
not endanger the species' survival.  Def.'s Resp. Mot. Summ. J. 24
(citing AR 1423).

Courts have held that "a project need not jeopardize the
continued existence of a threatened or endangered species to have
a 'significant' effect" for the purposes of NEPA.  Cascadia

Wildlands v. U.S. Forest Serv., 937 F. Supp. 2d 1271, 1282 (D. Or. 2013), appeal dismissed (Feb. 27, 2014); Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv., 373 F. Supp. 2d 1069, 1080 (E.D. Cal. 2004).[13]    In EPIC, the Ninth Circuit recognized that species viability is the relevant standard for assessing a project under the Endangered Species Act, but the standard is adverse effect under NEPA. Envtl. Prot. Info. Ctr. v. U.S. Forest Serv., 451 F.3d 1005, 1012 (9th Cir. 2006)("EPIC"); see Forest Serv. Employees for Envtl. Ethics v. U.S. Forest Serv., 726 F. Supp. 2d 1195, 1213 (D. Mont. 2010).

Here, although the White Castle Project may not drive the northern spotted owl to the verge of extinction, it would nonetheless have an adverse effect on the species. The project would remove 187 acres of forest, all or almost all of it designated critical habitat for the northern spotted owl and 153 acres of it suitable nesting, roosting and foraging habitat. AR

---

[13] Defendant-intervenors attempt to distinguish those cases, claiming the courts found a significant effect only because those projects would have resulted in the taking of spotted owl pairs, unlike in this case where there is no projected taking. Def.-Ints.' Resp. Mot. Summ. J. 9 n.3. Yet, defendant-intervenors then undermine this point by arguing that the Court must consider "the degree of adverse effect on a species, not the impact on individuals of that species." Id. at 8. (quoting Envtl. Prot. Info. Ctr. v. U.S. Forest Serv., 451 F.3d 1005, 1010 (9th Cir. 2006) ("EPIC")). EPIC found that the logging of 14 acres of suitable nesting roosting, and foraging habitat and the projected taking of three owl nests did not amount a significant effect for NEPA purposes. 451 F.3d at 1010-11. By contrast, this project involves no projected taking of owls but would log 153 acres of suitable nesting, roosting, and foraging habitat.

1028-29, 1359, 365-66, 748.[14]  The harvest is contained within three

overlapping spotted owl home ranges.  AR 748, 512.  It includes

portions of one core area[15] but no nests or projected taking of

spotted owls.  AR 748, 6468-70.  In the BiOp, FWS concluded that

the loss of home range habitat, in particular reductions in the

core area, would "adversely affect" northern spotted owls, as would

the loss of habitat for owl prey such as red tree voles and

northern flying squirrels.  AR 1412-13, 1421, 478-79.

BLM emphasizes the small size of the project, arguing that

"the minimal amounts of [spotted owl habitat] that will be impacted

by the White Castle Project simply cannot be viewed as significant

---

[14]  Notably, BLM has failed to provide clear information on
this point.  At oral arguments, the Court asked BLM to specify
the precise number of acres of critical habitat it would harvest
in the White Castle Project, but BLM failed to do so.  Instead,
BLM stated that 82% of the project area would be critical
habitat.  A subsequent review of record showed the 82% figure was
not accurate since it combined data from the White Castle Project
and the non-controversial Buck Rising Project.  AR 479.  Thus,
the information BLM supplied the Court did not reflect the true
impact of the White Castle Project alone.  BLM also did not
supply a project-specific figure in its briefs, nor in the
project's FONSI, EA, or decision document.  Environmental groups
have repeatedly commented that the project would remove 187 acres
of critical habitat, but BLM has neither confirmed nor denied the
number in written responses, instead referring groups to the EA
and decision document which do not provide the information.  AR
76-77, 359, 365-66, 748.  At oral argument, it was established
that the White Castle Project would harvest 153 acres of
suitable nesting, roosting, and foraging habitat, one type of
critical habitat.  However, it remains unclear how many acres of
critical habitat suitable for dispersal activities would be
logged.  See supra note 5.

[15]  The BiOp explains that "spotted owls are 'central place'
animals with the core use area (the area closest to the nest)
being the focal area."  AR 1412.

Page 25 - OPINION AND ORDER

for the purposes of NEPA in the context of the overall amount of habitat on federal lands." Def.'s Resp. Mot. Summ. J. 25. The Court recognizes that the degree of impact to the spotted owl might not be great enough, on its own, to require more study. However, this factor, combined with the others, requires an EIS.

### 5. Violation of Laws or Other Requirements

An additional factor is "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment." 40 C.F.R. § 1508.27(b)(10). As discussed in the next section, the Court does not reach the issue of BLM compliance with FLPMA with regard to red tree vole sites. Moreover, the Court need not address this particular factor given that the other significance factors suffice to establish a need for an EIS.

The Court recognizes the deference afforded to an agency, and when considered individually, several of the factors might not require an EIS. However, when considered together, they do. The project may be relatively small in size but it will adversely affect the northern spotted owl. Moreover, it represents a pilot test with effects that are likely to be highly controversial, highly uncertain, and influential on future project planning.

### C. Hard Look Requirement

Under NEPA, an agency must take a "hard look" at a project's

environmental consequences.[16]  In assessing whether the requirement

is met, a court must make "a pragmatic judgment" of whether an EA

or EIS's "form, content and preparation foster both informed

decision-making    and    informed    public    participation."

'Ilio'ulaokalani Coal., 464 F.3d at 1094.  "The 'hard look' must be

taken objectively and in good faith, not as an exercise in form

over substance, and not as a subterfuge designed to rationalize a

decision already made."  W. Watersheds Project v. Kraayenbrink, 632

F.3d 472, 491 (9th Cir. 2011).  The agency must discuss adverse

impacts and not minimize a project's negative effects.  Id.; Earth

Island Inst. v. U.S. Forest Serv., 442 F.3d 1147, 1159 (9th Cir.

2006), abrogated on other grounds by Winter v. Natural Res. Def.

Council, Inc., 555 U.S. 7 (2008).

 Crucial to determining whether an agency took a "hard look" is

whether the agency supplied "a 'convincing statement of reasons' to

explain why" it concluded the project's impacts were insignificant

_____

[16] Courts frequently treat the requirement that agencies take
a "hard look" at a proposed project's consequences as simply
another formulation of the "arbitrary and capricious" standard of
review in NEPA cases. See, e.g., Neighbors of Cuddy Mountain v.
U.S. Forest Serv., 137 F.3d 1372, 1376 (9th Cir. 1998)(hard look
analysis, also called "rule of reason," essentially the same as
the "arbitrary and capricious" standard); In Def. of Animals,
Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of
Interior, 751 F.3d 1054, 1068 (9th Cir. 2014).  Others address it
separately as a measure of the overall adequacy of an EA or EIS.
See, e.g., Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land
Mgmt., 387 F.3d 989, 992-93 (9th Cir. 2004); Churchill Cnty. v.
Norton, 276 F.3d 1060, 1071 (9th Cir. 2001).  Here, the Court
need not determine the standard's place in the NEPA framework to
find that BLM failed to take the requisite "hard look" at the
White Castle Project.

and did not prepare an EIS. Blue Mountains Biodiversity, 161 F.3d 1208 at 1212. Here, BLM's FONSI recited each significance factor, but failed to adequate explain its conclusion that none of them were significant. For example, the FONSI addressed the controversy significance factor in three short paragraphs, two of them summarizing the project's background. BLM then stated broadly and without further explanation that none of the project's public comments "established scientific controversy." AR 1009. As for the uncertainty significance factor, BLM only specifically addressed the issue of climate change, and did not mention public concerns about removal of spotted owl habitat. AR 1009-10. Although BLM listed out reasons in the project's FONSI, they were largely conclusory and did not demonstrate that BLM took a "hard look" at the project's potential effects.

Furthermore, as discussed in the next section, BLM failed to take a "hard look" at evidence of red tree vole nest sites in the project area. "NEPA's purpose is to ensure that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." Friends of the Clearwater, 222 F.3d 552, 557 (9th Cir. 2000). BLM received detailed data about a protected species six months before the EA was issued. Nonetheless, BLM failed to take a hard look at the data or the credibility of its source.

The Court finds BLM violated NEPA by not issuing an EIS, failing to consider a reasonable range of alternatives in the EA,

and by failing, in multiple respects, to take a hard look at the
project's environmental effects.

## II.  Red Tree Vole NEPA and FLPMA Claims

     Plaintiffs argue that BLM violated NEPA and FLPMA by failing
to comply with NWFP requirements for the survey and management of
red tree vole sites in the project area.[17]  FLPMA governs BLM's
planning and management of public lands and requires BLM to
"develop, maintain, and when appropriate, revise land use plans"
and, once they are in place, to act in accordance with them.
Oregon Natural Res. Council Fund v. Brong, 492 F.3d 1120, 1125 (9th
Cir. 2007); 43 U.S.C. §§ 1732(a); 43 C.F.R. § 1610.5-3.  Here, the
governing land use plan is the NWFP and the Roseburg District
Resource  Management  Plan  ("RMP")  which  incorporates  the
requirements of the NWFP.  The plans designate the red tree vole as
a Category C "uncommon" species.  AR 9948, 9987.  As such, BLM is
required to "manage all known sites" until high-priority and non-
high-priority red tree vole sites are determined.  AR 9948, 10014-

_____

     [17] In support of their FLPMA claims, plaintiffs cite to
declarations from Nicholas Sobb of Northwest Ecosystems Survey
Team ("NEST").  Pls.' Reply 32.  BLM moves to strike the
declarations as extra-record evidence.  Def.'s Reply 24.
Plaintiffs do not address BLM's argument and, as such, have not
shown that Sobb's declarations satisfy any exception to record
review rule under the APA.  See Lands Council v. Powell, 395 F.3d
1019, 1029-30 (9th Cir. 2005).  However, the Court does not rely
on the evidence to reach its conclusions.  Moreover, the Court is
capable of independently resolving conflicts in the record and
questions of admissibility, and therefore declines to strike the
evidence at issue.  See Oregon Natural Desert Ass'n v. Sabo, 854
F.Supp.2d 889, 925 (D.Or. 2012) (denying as moot defendants'
motion to strike where the "court has not considered the
extra-record evidence offered by plaintiffs").

16.[18]  The amended NWFP defines a "known site" as the "historic and current location of a species reported by a credible source, available to field offices, and that does not require additional species verification or survey by the Agency to locate the species."  AR 10014.  The plan adds that a "credible source" may include "amateurs" and "private individuals" provided they have sufficient "academic training and/or demonstrated expertise" in identifying the species.  AR 10014.

At issue here are the findings of amateur citizen surveyors who reported active red tree vole nest sites in one of the project's nine units, unit 31A.  Volunteers with the organization Northwest Ecosystem Survey Team ("NEST") climbed trees, conducted pre-decisional surveys, and submitted to BLM, on Oct. 11, 2011, evidence of four active red tree vole nest sites in Unit 31A.  AR 4008-11, 3006.  Their submissions included GPS coordinates and samples of resin ducts, fecal pellets, and cuttings.  AR 4008.  An accompanying letter described NEST volunteers as receiving 40 hours each of training from biologists and professionals, among other qualifications.  AR 4008.  It also described NEST's chain of custody procedures; provided contact information for further inquiry; listed previous submissions of data to Coos Bay BLM, Willamette National Forest, and Umpqua National Forest; and named

---

[18]  No such determination occurred here.  The EA proposed designating project unit 25A as a non-high-priority site but did propose such a designation for the area in dispute, unit 31A.  AR 6598-6609.

individual references, including an Oregon State University professor and a wildlife biologist with the Willamette National Forest. AR 4008, 4011. Plaintiffs argue that the nesting sites identified by NEST qualified as "known sites," and BLM failed to manage them in violation of the NWFP, FLPMA, and NEPA. Pls.' Mem. Mot. Summ. J. 38-40. BLM acknowledges the amended NWFP required it to manage known vole sites in Unit 31A, but argues that NEST was not a "credible source" of known site information. Def.'s Reply 22-23; Def.'s Resp. Mot. Summ. J. 33-34.

BLM's argument before the Court echoes its rationale in project documents for not considering NEST data. AR 3006, 6480. The EA stated: "NEST members' training, their credentials, and the chain of custody of the samples are self-reported and have not been verified. For these reasons, their reported site locations . . . are not considered to be protocol survey data." AR 6480, 3006. BLM became aware of NEST's survey plans in June 2011 due to NEST's participation in a different BLM project in Coos Bay. AR 4729. In August 2011, BLM surveyors and biologists interacted with NEST volunteers on various occasions at the project site and notified BLM project leaders of their presence. AR 4309, 4314-20. Finally, BLM received the NEST data and letter in October 2011-- six months before BLM issued the EA. AR 2613-16; 4309. In that time, it does not appear from the record or pleadings that BLM asked NEST for more information or otherwise sought to verify NEST's qualifications or the sites even though the coordinates were

provided and the sites marked. AR 3006, 6480. In March 2012, a NEST leader emailed the BLM field manager in charge of the project, inquired how the agency was using the NEST data, and offered to submit more information or personally lead BLM surveyors to the sites. AR 2615-16. The BLM Field Manager declined to respond to the inquiry about the use of NEST data or to receive any additional information until after release of the EA. AR 2615.

It is debatable whether BLM's rejection of NEST's surveys constitutes a violation of the NWFP requirement to survey and manage "known sites." Regardless, NEPA mandates that an agency take a "hard look" at a proposed project's environmental consequences, adequately considering every significant aspect, and informing the public of its reasoning and conclusions. Earth Island Inst. v. U.S. Forest Serv., 351 F.3d 1291, 1300-01 (9th Cir. 2003); Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 97 (1983). NEPA "emphasizes the importance of coherent and comprehensive up-front environmental analysis to ensure informed decision making to the end that the agency will not act on incomplete information." Ctr. for Biological Diversity v. U.S. Forest Serv., 349 F.3d 1157, 1166 (9th Cir. 2003). Here, NEPA did not necessarily require BLM to accept the NEST data or even to independently verify it, but it required appropriate consideration of the data and a coherent explanation for rejecting it. Instead, BLM relied on circular reasoning to reject NEST data, arguing the data was "self-reported" and unverified but rejecting efforts by

NEST to provide such verification. BLM declined, without adequate explanation, to consider possible impacts to a species protected under the NWFP. In doing so, BLM made a decision that was not "fully informed and well-considered," and BLM failed to "articulate a rational connection between the facts found and the conclusions reached." Sierra Club, 510 F.3d at 1023. The Court finds that BLM did not take a "hard look" at environmental impacts, and its rejection of NEST data without sufficient consideration or explanation was arbitrary and capricious in violation of NEPA.

## III. Remedies

The APA states that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see Sierra Forest Legacy v. Sherman, 646 F.3d 1161, 1184-85 (9th Cir. 2011). On this basis, this Court holds unlawful and vacates BLM's analysis and approval of the White Castle Project.[19]

Plaintiffs also ask the Court to grant injunctive relief halting the White Castle Project until BLM complies with NEPA. Pls.' Mot. Summ. J. 2-3. However, even when a court finds a NEPA violation, "an injunction should issue only if the traditional

---

[19] Despite the mandatory language of the APA, the Ninth Circuit has held that in limited circumstances, the court may leave in place an action that violates the APA but only if "equity demands" it. Idaho Farm Bureau Federation v. Babbitt, 58 F.3d 1392, 1405 (9th Cir. 1995). The Court has analyzed the equities and finds no such circumstances here.

four-factor test [for an injunction] is satisfied." <u>Sierra Forest</u> <u>Legacy</u>, 646 F.3d at 1184 (quoting <u>Monsanto</u>, 561 U.S. at 157) (internal quotation marks omitted).[20]  Moreover, the Supreme Court recently held that recourse to the "additional and extraordinary relief of an injunction" was not warranted if a less drastic remedy, such as vacatur of the offending action, was sufficient to redress the plaintiff's injury. <u>Monsanto</u>, 561 U.S. at 165-66; <u>Ctr.</u> <u>for Food Safety v. Vilsack</u>, 734 F. Supp. 2d 948, 954 (N.D. Cal. 2010). Here, the vacatur of BLM's inadequate EA and authorization of the White Castle project will provide sufficient relief, since, by law, BLM cannot proceed with the project until it complies with NEPA.  Plaintiffs have not provided evidence to the contrary.  As such, the Court declines to issue an injunction.

Plaintiffs also move for an award of costs and attorneys' fees under the Equal Access to Justice Act.  28 U.S.C. § 2412.  A decision concerning attorney fees and costs will issue at a later date, following a proper motion. <u>See</u> 28 U.S.C. § 2412(d)(1)(B).

## CONCLUSION

For above reasons the Court GRANTS Plaintiffs' Motion for Summary Judgment (Doc. 23) as to the NEPA claims and DENIES

---

[20] Under the four-factor test, the moving party must show "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." <u>Monsanto</u>, 561 U.S. at 156-57; <u>Abbey</u>, 719 F.3d at 1054.

Page 34 - OPINION AND ORDER

Defendant and Defendant-Intervenors' Cross-Motions for Summary Judgment (Docs. 28, 27). The Court SETS ASIDE the White Castle Project's authorization, holding that BLM violated NEPA and APA.

IT IS SO ORDERED.

Dated this 14th of ~~February~~ March 2015.

_____
Ann Aiken
United States District Judge